924 F.2d 506
 18 Fed.R.Serv.3d 1054, 32 Fed. R. Evid. Serv. 284
 UNITED STATES of America
v.
27.93 ACRES OF LAND, MORE OR LESS, SITUATE IN CUMBERLAND
COUNTY, COMMONWEALTH OF PA. TRACT NO. 364-07;
Alex A. DiSanto, et al.
Appeal of Alex DISANTO and Dona DiSanto.
 No. 90-5446.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 9, 1990.
Decided Jan. 29, 1991.
 
 Richard B. Stewart, Asst. Atty. Gen., U.S. Dept. of Justice, Lands Div., Washington, D.C., James J. West, U.S. Atty., Robert J. DeSousa, Robert R. Long, Jr., Asst. U.S. Attys., Office of U.S. Atty., Scranton, Pa., Robert Plotkin, Jacques B. Gelin, Ellen J. Durkee (argued), U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., for appellee.
 Alvin B. Lewis, Jr. (argued), Mark E. Lovett, Hartman, Underhill & Brubaker, Lancaster, Pa., for appellants.
 Before SLOVITER, SCIRICA, and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Alex and Dona DiSanto (the "DiSantos"), defendants in a condemnation proceeding brought by the United States, appeal the district court's order dismissing their post-trial motions for a new trial and relief from judgment. The district court had jurisdiction pursuant to 28 U.S.C. Secs. 1345 and 1358 (1988). We have jurisdiction under 28 U.S.C. Sec. 1291 (1988).
 
 I. FACTS
 
 2
 In 1971, the DiSantos purchased 130 acres of land in Silver Spring Township, (the "Township"), Cumberland County, Pennsylvania for investment purposes. The property consisted of two tracts of land, one 98 acres and the other 32 acres.
 
 
 3
 Lying along the eastern border of the 98 acre tract and separating it from the 32 acre tract is an approximately 100 foot wide strip of land owned in fee simple by the Pennsylvania Power and Light Company. The southern border of the 98 acre tract is along U.S. Highway 11, Carlisle Pike. Privately owned acreage used for agricultural purposes as well as land owned by the National Park Service used for the Appalachian National Scenic Trail abut the north, west, and northwest boundaries of the 98 acre tract. It is contiguous to land owned by the National Park Service, some of which was recently acquired by the Park Service through other condemnation actions.
 
 
 4
 In December 1985, the government first contacted the DiSantos concerning their property. At that time, the DiSantos refused to discuss the government's proposal to acquire 27.93 acres, which lay in the northwest region of the 98 acre tract. They also refused to authorize a government appraisal. From December 1985 to July 1987, the government and the DiSantos discussed a possible purchase, but no agreement was reached. On July 28, 1987, the government filed in the district court a complaint in condemnation and a notice of condemnation to acquire the 27.93 acre tract for the Appalachian National Scenic Trail.[1]
 
 
 5
 At the time that formal condemnation proceedings were initiated, the DiSantos' 98 acre tract was subject to two zoning classifications. A strip of the DiSantos' land abutting Carlisle Pike and lying along the southern border of the 98 acre tract was zoned "C-2 Highway Commercial District." That strip constituted approximately 28 acres of the 98 acre tract. A large portion of the 28 acre commercial strip fell within the 100 year floodplain in which improved uses were restricted by the Silver Spring Township Flood Plain ordinance. The remainder of the 98 acre tract, including the entire 27.93 acre tract sought by the government, was zoned agricultural but permitted some residential development.
 
 
 6
 In 1987, the Township began to devise a comprehensive plan that included a proposed enterprise district. Under the proposed enterprise district significant portions of the agricultural property in the Township were to be rezoned commercial. The details of the commercial zoning as well as the parameters of the enterprise district were changed on numerous occasions, and neither was finalized until the enterprise district was approved and adopted by the Township on December 27, 1989.
 
 
 7
 From late July 1987 to December 1988, the government and the DiSantos engaged in settlement discussions, but they were unable to agree upon the value of the condemned tract. Consequently, on December 13, 1988, the government notified the district court that no settlement agreement would be reached by December 30, 1988, and requested that the district court put the case on its docket. The case was listed on January 5, 1989, but continued.
 
 
 8
 On January 31, 1989, the DiSantos filed an application with the Township planning board requesting that all their acreage be rezoned C-2 Highway Commercial. The Township planning board recommended approval of the application. The application then was sent to the Cumberland County Planning Commission (the "Planning Commission").
 
 
 9
 On February 2, 1989, the district court scheduled a jury trial for June 1989 and ordered that discovery be completed by May 1, 1989. Prior to the close of discovery, the DiSantos' counsel informed the government that the DiSantos' application for rezoning their property commercial had been "tentatively approved" and that the DiSantos' expert appraised the property as commercial rather than agricultural. Thereafter the parties agreed to file a joint motion to permit discovery of the basis for the commercial appraisal and to postpone trial. The court extended the discovery deadline to July 7, 1989, and set the trial date for August 4, 1989.
 
 
 10
 On May 18, 1989, the Planning Commission recommended to the Township Board of Supervisors, (the "Board"), that the DiSantos' request to rezone their property C-2 Highway Commercial be denied. The Planning Commission offered four reasons for its recommendation: (1) the proposed change was not consistent with the Township's future land use; (2) the proposed change was inconsistent with the Township's Comprehensive Plan that identifies the tract as being preserved for agricultural use; (3) the increased traffic could negatively impact Carlisle Pike, the town of New Kingston, and pedestrian safety near the Appalachian Trail; and (4) the enterprise district should be in place before any major rezoning along Carlisle Pike was considered.
 
 
 11
 The DiSantos' rezoning request was considered by the Board at its meeting on July 26, 1989. At that meeting, the DiSantos' prospective development plans were described. It was represented to the Board that some of the DiSantos' land was included in the present version of the proposed enterprise district.
 
 
 12
 When questioned by the Board, the DiSantos' representative acknowledged that the DiSantos requested that all of their land be rezoned C-2 Highway Commercial, including the 27.93 acres sought by the government. The DiSantos' representative stated that the DiSantos did not intend to use the requested zoning change to obtain a higher price from the government for the condemned tract.
 
 
 13
 At the July 26 meeting, some citizens spoke in opposition to the DiSantos' rezoning request. In addition, the Township engineer stated that the Township's present residual capacity was not sufficient to service the development that the DiSantos had proposed. In addition, the Board noted that the DiSantos requested C-2 Highway Commercial zoning might prove inconsistent with the commercial zoning included in the proposed enterprise district. Finally, the Board mentioned that it had received a letter from the government concerning the DiSantos' rezoning request. The letter stated that the government opposed the rezoning request for the land adjacent to the Appalachian Trial because agricultural zoning "offered a high degree of protection" and "the most appropriate environment" for the Appalachian Trail.
 
 
 14
 On July 28, 1989, the government filed a motion in limine requesting that the district court bar the DiSantos from introducing evidence of the highest and best use of the tract for any other than agricultural purposes. The government's motion also requested the district court to exclude evidence of internal estimates of value by the National Park Service, maps, plans or plots showing proposed development or subdivision, and evidence of severance damage to the remaining property.
 
 
 15
 On August 23, 1989, the Board denied the DiSantos' request to rezone their property commercial, and the government notified the court of the Board's action. On September 20, 1989, the district court granted the government's motion in limine in its entirety and denied the DiSantos' motion to reopen discovery and extend the trial date. At that time, the district court set October 2, 1989 as the trial date.
 
 
 16
 The DiSantos filed a motion for reconsideration, and requested the district court to hold an evidentiary hearing and to extend the trial date. Although the district court did not extend the trial date, it held an evidentiary hearing on October 2, 1989. At the evidentiary hearing, the district court determined that the DiSantos' could not present expert testimony on the commercial value of their land. As a consequence, and without prejudicing their right to appeal the ruling, the DiSantos stipulated to the government expert's appraisal of $213,000, the appraised value of the land under agricultural zoning. On October 3, 1989, the valuation trial was held, and on October 6, 1989, the district court entered a judgment in favor of the DiSantos for $213,000.
 
 
 17
 On October 12, the Planning Commission tentatively approved the proposed enterprise district, subject to certain recommendations concerning its boundaries and the extent of commercial development permitted. On October 16, 1989, the DiSantos filed a motion for a new trial claiming that the district court made numerous errors in its discovery and evidentiary rulings, thus depriving them of just compensation.
 
 
 18
 On December 27, 1989, the Township adopted a modified version of the enterprise district that rezoned some of the DiSantos' property commercial. The condemned tract was not included in the enterprise district, and its zoning remained agricultural.
 
 
 19
 On January 4, 1990, while their motion for a new trial was still pending, the DiSantos filed a motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b). On April 20, 1990, the district court dismissed the DiSantos' motions for a new trial and relief from judgment. The DiSantos filed a timely notice of appeal of the order denying those motions.
 
 II. DISCUSSION
 
 20
 The DiSantos contest the amount the government paid for the condemned tract of land. They contend that the district court erred in numerous discovery and evidentiary rulings and in denying their Fed.R.Civ.P. Rule 60(b) motion. These errors, the DiSantos assert, constituted a violation of due process and resulted in a taking of property without just compensation.
 
 A. Discovery Issues
 
 21
 The DiSantos assert that three discovery rulings of the district court were in error. These rulings denied the DiSantos' requests to: (1) reopen discovery to investigate the government's motive in opposing the DiSantos' rezoning request; (2) require the government to produce internal memoranda concerning their motive in opposing rezoning; (3) compel the government to produce two prior appraisals of the condemned property.
 
 
 22
 Because the first two purported errors concern the government's motive for opposing the DiSantos' rezoning request, they will be treated together. Our review of the district court's discovery orders is for abuse of discretion. Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1213 (3d. Cir.1984). "To find such abuse it is necessary to conclude there has been an interference with a 'substantial right' or that the discovery ruling is 'seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case.' " Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir.1983) (citations omitted), cert. denied, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).
 
 1. The Government's Motive
 
 23
 The DiSantos desired to impugn the government's motive in opposing their rezoning request. They assert that discovery would have revealed that the government's opposition to their rezoning request was improper under United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir.) ("if government's sole motive in resisting the change in zoning was to depress the market value of the property which it intended to condemn, the court's estimate of the probability of rezoning ... should not have reflected this opposition"), cert. denied, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958). Thus, they contend that with further discovery they would have been able to establish that the condemned tract had commercial value.
 
 
 24
 The government responds that its opposition to rezoning was not material to the district court's decision, and that, in any event, its role was both minimal and appropriate. Moreover, the government points out that the DiSantos were permitted extensive discovery as to the government's motive.
 
 
 25
 Even if we were to agree with the DiSantos' contention that the district court relied upon the government's opposition to rezoning,[2] they have not shown that the district court erred in concluding that further discovery "would have amounted to a fishing expedition to investigate what appears to the court an appropriate opposition to a zoning change by an adjoining landowner."
 
 
 26
 The DiSantos do not contest the fact that the government could oppose the zoning change as an adjoining landowner. See id. Instead, they claim that the government's primary motive was the improper one of using zoning to keep the price down. Their contention, however, stands entirely unsupported. As the government points out, the DiSantos were permitted further discovery. The DiSantos deposed the author of the letter notifying the Board of the government's opposition to rezoning. Despite this additional discovery, the DiSantos offered nothing more than conclusory assertions that the government's primary motive was improper.
 
 
 27
 We believe, therefore, that the district court's denial of the DiSantos' request to reopen discovery and supplement the production of documents with internal memoranda was not an interference with a substantial right or a gross abuse of discretion resulting in fundamental unfairness in the valuation trial.
 
 2. Prior Appraisals
 
 28
 The DiSantos contend that the district court erred in not permitting them to supplement the record with two prior appraisals by the government's expert. These appraisals valued the land at less than $213,000, the amount of the 1989 agricultural appraisal used by the government and stipulated to by the DiSantos at the evidentiary hearing. The DiSantos claim that they had the right to receive the earlier appraisals and introduce them into evidence because the appraisals could have been used to impeach the credibility of the government's expert.
 
 
 29
 The DiSantos do not state how the prior appraisals could have been used for impeachment purposes. They only suggest that the increase in the appraised value might reflect the appraiser's anticipation of the enactment of the zoning change. The district court found the prior appraisals irrelevant, and stated that "[r]egardless of the reason for the increases, the fact remained that the DiSantos had no counter-appraisal based on agricultural zoning of the tract."
 
 
 30
 The prior appraisals were made in two previous years. Each appraisal valued the land for less than $213,000. We cannot, therefore, understand how the DiSantos intended to use the prior appraisals to impeach the government appraiser's credibility or his most recent appraisal. Moreover, the record contains nothing that suggests that the government's appraiser anticipated a zoning change. Thus, the DiSantos' contention to the contrary is purely speculative.
 
 
 31
 We believe, therefore, that the district court properly rejected the DiSantos' argument for requiring the government to produce the prior appraisals. Consequently, we think that the district court's determination that the prior appraisals were without probative value was not improper and its denial of the DiSantos' production request was within a sound exercise of discretion.
 
 B. The Evidentiary Rulings
 
 32
 The DiSantos also assert that the district court erred in excluding the following evidence at the valuation trial: (1) their expert's appraisal valuing the property as having commercial use (the "commercial appraisal"); (2) the 1985 valuation of the DiSantos' property by Gordon Cook, the government's Chief of Appraisal Division (the "internal valuation"); and (3) testimony valuing severance damages suffered by the DiSantos.
 
 
 33
 In the context of condemnation proceedings, "questions regarding the admissibility of evidence are left to the discretion of the trial court." See United States v. 412.93 Acres of Land, 455 F.2d 1242, 1247 (3d Cir.1972). Thus, we review the trial court's evidentiary rulings for abuse of discretion.
 
 1. The Commercial Appraisal
 
 34
 The government appropriated the DiSantos' land in a "straight-condemnation" under 40 U.S.C. Sec. 257. Kirby Forest Indus. v. United States, 467 U.S. 1, 3, 104 S.Ct. 2187, 2190, 81 L.Ed.2d 1 (1984). Thus, Fed.R.Civ.P. 71A(h) applied.[3] That Rule mandated that the district court screen the proffered commercial use to determine whether the DiSantos had demonstrated that a commercial use of the condemned tract was practicable and reasonably probable. See United States v. Reynolds, 397 U.S. 14, 19, 90 S.Ct. 803, 807, 25 L.Ed.2d 12 (1970) (Rule 71A(h) provides that "except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented."). Since the judge concluded that the proffered commercial use was not reasonably probable, it excluded from jury consideration any evidence whose admissibility depended upon the DiSantos' property having such use.
 
 
 35
 The DiSantos contend that the district court erred in excluding the commercial appraisal. The DiSantos concede that the admissibility of the commercial appraisal depended in part on showing that there was a reasonable probability that their land would be rezoned commercial. They argue that the district court's determination that there did not exist a reasonable probability of the condemned tract being rezoned commercial was erroneous. In the alternative, the DiSantos contend that the commercial appraisal should have been admitted because it came within the district court's description of an admissible appraisal.
 
 
 36
 The DiSantos assert that they introduced sufficient evidence for a jury to conclude that there was a reasonable probability that their land would be rezoned commercial. Assuming, without deciding, that the issue of highest and best use is for the jury, cf. United States v. 341.45 Acres of Land, 633 F.2d 108, 111 (8th Cir.1980) (issue of highest and best use is not solely for the trial judge under Rule 71A(h)), cert. denied, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981), the DiSantos had the pretrial burden of showing that the condemned tract "is adaptable and needed or likely to be needed in the reasonably near future" for commercial use. See United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 273, 275-76, 63 S.Ct. 1047, 1051, 1052-53, 87 L.Ed. 1390 (1943) (citing Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934)). To carry this burden, we assume that it was sufficient for the DiSantos to show, by a preponderance of the evidence, that a jury could reasonably find that the condemned tract would be rezoned commercial. We assume further that our review of the district court's conclusion that the DiSantos failed to carry their pretrial burden is plenary.
 
 
 37
 In support of their position, the DiSantos point out that they introduced evidence showing that the Township was considering an enterprise district, that no one from the Board testified that there was not a reasonable probability that the enterprise district would be enacted, and that the condemned tract was included in the enterprise district as of October 2, 1989, the date of the evidentiary hearing. Moreover, the DiSantos note that they introduced evidence showing that the proposed enterprise district permitted some commercial uses. Finally, the DiSantos point out that on October 12, 1989 the Planning Commission recommended approving the enterprise district and that on December 27, 1989, the enterprise district was adopted. They further assert that but for the government's condemnation, the 27.93 acre tract would have been rezoned commercial.
 
 
 38
 The government contends that the factual findings of the district court justify its determination that there was not a reasonable probability of the condemned tract being rezoned commercial. Moreover, the government responds that no one testified that there was a reasonable probability of rezoning, and hence the DiSantos failed to carry their burden of showing that a reasonable probability of rezoning existed. Finally, the government argues that the enactment of the enterprise district on December 27, 1989, does not demonstrate reversible error. The government contends that post-judgment enactment is not properly part of the district court record, and that even if the enactment of the enterprise district were considered relevant evidence, the condemned tract was not included in the enterprise district.
 
 
 39
 Preliminarily, we note that at the time of the trial the government had not appropriated or taken the DiSantos' property. See Kirby, 467 U.S. at 4, 12, 104 S.Ct. at 2191, 2195 ("taking does not occur until the termination of condemnation proceedings brought under Sec. 257"). In such cases, "straight condemnation," the first day of the trial is the most appropriate valuation date. See id. at 9 n. 11, 104 S.Ct. at 2193 n. 11. Under the present circumstances, however, the day before the trial the district court held an evidentiary hearing. Thus, we believe that October 2, 1989 should serve as the valuation date, and the evidence relevant to the district court's determination as to whether there was a reasonable probability of rezoning was the evidence before the court on that date. Consequently, the recommendation of the Planning Commission on October 12, 1989, and the enactment of the enterprise district on December 27, 1989, are not relevant to our review of the district court's determination that there was not a reasonable probability that the condemned tract would be rezoned commercial.
 
 
 40
 We think that the district court's factual findings adequately support its determination that the DiSantos had not carried their pretrial burden. As the district court stated:
 
 
 41
 [T]estimony at the evidentiary hearing [held on October 2, 1989] revealed that after public hearing, the plan could be accepted or rejected; the plan as drafted could be changed; a previous request for rezoning the entire tract had been denied; a well-respected, vocal citizens group opposed to further commercial development had been responsible for removal of another area from the plan, would have an opportunity to express its views on the Enterprise District and would be very influential in the fate of the plan; the concern over preservation of agricultural land could cause the plan to be rejected; and the attitude of the community would have to be reflected in the decision. Additionally, one member of the Board of Supervisors specifically testified that he simply could not say whether there was a reasonable possibility that the Enterprise District would be adopted as proposed. [citations to evidentiary transcript omitted].
 
 
 42
 In addition, we note that the only evidence suggesting that the condemned tract would be rezoned commercial was a map of the enterprise district that included the condemned acreage. The boundaries of the enterprise district, however, had only been suggested by the landscape architectural firm responsible for drafting plans for the proposed enterprise district. As of October 2, 1989, neither the Planning Commission nor the Board had approved the proposed boundaries. Furthermore, as the district court noted, a Board member testifying at the evidentiary hearing stated that he could not say whether there was a reasonable probability that the proposed enterprise district, as then drafted, would be adopted.
 
 
 43
 We also note that the DiSantos have offered no evidence to support their claim that but for the government's actions, the proposed enterprise district would have included the 27.93 acres. Even if we accepted the DiSantos' contention that the government played some role in the Board's denial of the DiSantos' rezoning request, it does not follow that the government's actions were the "but for" cause of the Board's removal of the condemned tract from the enterprise district. As the record shows the Planning Commission had reservations about the consequences of rezoning on the Appalachian Trail as early as May 18, 1989, at least two months prior to the government's letter opposing rezoning. Moreover, we cannot say that the opposition voiced by various citizens at the Board meeting did not influence the Board's final decision.
 
 
 44
 We conclude, therefore, that the DiSantos failed to show, by a preponderance of evidence, that a jury could reasonably find that there was a reasonable probability that the condemned tract would be rezoned commercial. Consequently, that issue was properly not submitted to the jury.
 
 
 45
 The DiSantos contend that, in any event, the district court erred because the commercial appraisal satisfies the district court's description of "an appraisal ... reflect[ing] what someone would pay for the land with the alleged possibility that it would be rezoned...." Thus, the DiSantos assert, the commercial appraisal was relevant and admissible.
 
 
 46
 The commercial appraisal was performed by William Daylor. In making his appraisal, Daylor first concluded that the land would be rezoned commercial. Then, drawing upon sales of nearby property that "had been developed or subdivided" as permitted under commercial zoning, he offered opinions as to the value of the 98 acre tract before the taking and the value of the remaining acreage after the taking.
 
 
 47
 Daylor's methodology clearly demonstrates that the appraisal was made under the assumption that the DiSantos' property would be rezoned commercial. In making his evaluation, Daylor ignored the possibility that the DiSantos' rezoning request would be denied. Furthermore, Daylor's appraisal was based, in part, upon sales of property where commercial zoning was less restrictive that C-2 Highway Commercial, and thus far less restrictive than the commercial zoning included in the enterprise district. Consequently, Daylor's commercial appraisal is not "an appraisal of agricultural land that might be rezoned for commercial use," and the district court properly excluded the commercial appraisal as speculative and irrelevant.
 
 2. The Internal Valuation
 
 48
 The DiSantos contend that the district court erred by excluding the internal valuation by Gordon Cook, Chief of the Appraisal Division. The DiSantos argue that the internal valuation was an "internal appraisal" that was made pursuant to 42 U.S.C. Sec. 4651 and should have been produced at trial.[4] As authority for their position, the DiSantos cite United States v. 320.0 Acres of Land, 605 F.2d 762 (5th Cir.1979).
 
 
 49
 The government contends that the internal valuation is not a Sec. 4651 statement, but merely a budgetary estimate. In support of its position, the government points out that the internal valuation preceded any government appraisal, and was never communicated to the DiSantos as a statement of just compensation. Thus, the government argues that 320.0 Acres does not support the DiSantos' position. Instead, the government asserts that the internal valuation was simply a "budgetary estimate" similar to that excluded from evidence in United States v. Two Tracts of Land, 412 F.2d 347, 350 (2d Cir.), cert. denied, 396 U.S. 906, 90 S.Ct. 222, 24 L.Ed.2d 183 (1969).
 
 
 50
 The district court concluded that the internal valuation was "irrelevant" because it was an "internal, informal appraisal ... made for budgetary purposes and ... not based on a full evaluation of the subject tract." Consequently, the district court excluded the document as inadmissible evidence.
 
 
 51
 The internal valuation was made in December 1985, and estimated the value of the tract to be significantly higher than the government's 1989 appraisal of $213,000. That valuation explicitly states that the DiSantos had not authorized an appraisal, and the DiSantos have not challenged the government's claim that the internal evaluation was never sent to them as a statement of just compensation. We believe, therefore, that the DiSantos' reliance on 320.0 Acres is misplaced. In that case, a statement of just compensation under Sec. 4651 was made "after an approved appraisal of the fair market value of the property," and its admissibility was contingent on the fact that it had been communicated to the landowner.
 
 
 52
 Our review of the document has revealed that the valuation was simply an "[e]stimated value" of the land. Although it is not clear for whom the document was prepared and what purpose the estimate was to be used, the document does indicate that one of its purposes was to report the government's actual and projected investment for purchasing six properties in the Appalachian Trial corridor. Thus, we believe that the district court's conclusion that the document was made for budgetary purposes is accurate, and thus, its exclusion of the internal evaluation was within a sound exercise of discretion.
 
 3. Evidence of Severance Damages
 
 53
 The DiSantos claim that substantial fill was lost from the condemned tract, and that they should have been permitted to introduce testimony valuing this fill. Therefore, the DiSantos contend that the district court erred by barring expert testimony valuing their severance damages.
 
 
 54
 The district court concluded "that there was no foundation for the introduction of such testimony because no test borings had been performed on the land, no permits to excavate had been obtained or even applied for, and unity of use had not been shown." Furthermore, the district court rejected the DiSantos' contention that the existence of test borings and permits went to the weight of the evidence, not its admissibility.
 
 
 55
 "If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract." United States v. Miller, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943). To receive that value as severance damages, the landowner must show that there is "a reasonable probability of the lands in question being combined...." Powelson, 319 U.S. at 275, 63 S.Ct. at 1053. We believe, therefore, that, at the very least, the admissibility of the testimony estimating the value of the DiSantos' severance damages depended upon their showing that there was a reasonable probability that the condemned tract contained suitable fill for the acreage not condemned.
 
 
 56
 The district court concluded that the DiSantos did not introduce evidence substantiating their claim that the condemned tract contained suitable fill, but only evidence valuing the severance damages. On appeal, they do not point to any evidence that the district court overlooked on this matter. We conclude, therefore, that the DiSantos' testimony concerning severance damages was properly excluded as speculative.
 
 C. Motion for Relief From Judgment
 
 57
 The DiSantos contend that the district court erred by denying their motion for relief from judgment under Fed.R.Civ.P. 60(b). They assert that the enactment of the enterprise district on December 27, 1989, less than three months after the district court's decision and less than two months after the government's taking, justified such relief.[5]
 
 
 58
 The government contends that the post-judgment enactment of the enterprise district is not a ground for relief under Rule 60(b). It argues that the authority upon which the DiSantos rely does not support their request.
 
 
 59
 Preliminarily, we note that it is not clear to us upon which subsection of Rule 60(b) the DiSantos rely. Footnote 13 in their appellate brief suggests that they requested relief pursuant to either Rule 60(b)(2) or (6). We shall, therefore, evaluate the DiSantos' entitlement to relief under both of these subsections. Our review of the district court's denial of Rule 60(b) relief is for abuse of discretion. Bowder v. Director, Illinois Dep't of Corrections, 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521 (1978); Harris v. Martin, 834 F.2d 361, 364 (3d Cir.1987).
 
 
 60
 Under Rule 60(b) the district court could "upon such terms as are just ... relieve a party from a final judgment, order, or proceeding ... [if] (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) ... or (6) any other reason justifying relief from the operation of a judgment." The DiSantos contend that the Planning Commission's approval of the enterprise district on October 12, 1989 and the enactment of the enterprise district on December 27, 1989 constituted grounds for relief.
 
 
 61
 Under Rule 60(b)(2) "the phrase [newly discovered evidence] refers to evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant." Brown v. Pennsylvania R.R., 282 F.2d 522, 526-27 (3d Cir.1960), cert. denied, 365 U.S. 818, 81 S.Ct. 690, 5 L.Ed.2d 696 (1961). The Planning Commission's approval and the Township's enactment of the enterprise district occurred after the trial. Thus, they do not constitute grounds for relief under Rule 60(b)(2) because they were not "facts in existence at the time of trial."
 
 
 62
 Under Rule 60(b)(6) a court may provide relief " 'only in cases evidencing extraordinary circumstances.' " Martinez-McBean v. Government of Virgin Islands, 562 F.2d 908, 911 (3d Cir.1977) (quoting Stradley v. Cortez, 518 F.2d 488, 493 (3d Cir.1975)). The DiSantos contend that the post-judgment enactment of the enterprise district is just such an extraordinary circumstance.
 
 
 63
 In support of their claim, the DiSantos assert that the Supreme Court's decision in Kirby Forest Indus. v. United States, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) is "highly instructive." They suggest that an appropriate extension of Kirby is to use Rule 60(b) "to correct a wrong where valuation is substantially inadequate as a result of the passage of time." In this regard, they assert that "[t]he beauty of Rule 60(b) ... is that it gives a court an opportunity to use the benefit of hindsight." Furthermore, they contend that such relief is justified by the district court's unwillingness to postpone the trial date.
 
 
 64
 The district court stated that regardless of what happened subsequently, the court could not, at the time of trial, conclude that there was a reasonable probability that the enterprise district would be enacted. Moreover, it noted that its failure to extend the trial date was appropriate since there had already been numerous delays based upon the DiSantos' representations that commercial zoning would be enacted in the near future. Thus, the district court concluded that the wisdom of hindsight should be avoided, and that the DiSantos should not be relieved from the judgment.
 
 
 65
 We have held that the district court did not err by determining that there was no reasonable probability of rezoning on the first day of trial. Moreover, given the numerous delays and the final decision of the Board to deny the DiSantos' rezoning request, we believe that the district court acted within its discretion by refusing to extend the trial date another time. Thus, the only issue is whether the post-judgment enactment of the enterprise district is an "extraordinary situation ... [where the use of Rule 60(b) would] not violate the principle of the finality of judgments." Kock v. Government of Virgin Islands, 811 F.2d 240, 246 (3d Cir.1987).
 
 
 66
 In Kirby, the Supreme Court stated that Rule 60(b) "seems to us expansive enough to encompass a motion, by the owner of condemned land, to amend a condemnation award." Id. 467 U.S. at 18, 104 S.Ct. at 2198. The Court went on to state:
 
 
 67
 The evidence adduced in consideration of such a motion would be very limited. The parties would not be permitted to question the adjudicated value of the tract as of the date of the original valuation; they would be limited to the presentation of evidence and arguments on the issue of how the market value of the property was altered between that date and the date on which the judgment was paid by the Government.
 
 
 68
 Id.
 
 
 69
 As we have already stated, the valuation date was October 2, 1989, and the government paid the judgment on November 8, 1989. Between those dates, the only change possibly affecting the market value of the condemned tract was the Planning Commission's recommendation of the proposed enterprise district. That recommendation does not constitute an exceptional circumstances warranting Rule 60(b)(6) relief.
 
 
 70
 The minutes of the Planning Commission's meeting reveal that some members believed that the boundaries of the enterprise district should be adjusted to include more agricultural land, and the DiSantos' property is explicitly cited as an area where adjustment was necessary. Furthermore, the letter sent by the Planning Commission to the Board stated that the boundaries of the enterprise district were not consistent with the major purpose of the district, to control commercial development. It also noted its concern with the enterprise district's impact on the Appalachian Trail, and recommended that the enterprise district's boundaries be modified accordingly. Thus, even if we were to ignore the fact that no substantial delay occurred between the valuation date and the date on which the judgment was paid, a fact distinguishing the present case from Kirby, the only evidence suggesting a change in the market value of the condemned tract shows that any increase in value was highly speculative.
 
 
 71
 Furthermore, even if we were willing to extend Kirby to its outermost limits and consider the enactment of the enterprise district on December 27, 1989, the DiSantos' would fare no better under Rule 60(b)(6). As enacted, the enterprise district does not include the condemned tract. Although the DiSantos contend that but for the government's actions the enterprise district would have included the condemned tract, they failed to offer evidence supporting that claim. The fact that a version of proposed enterprise district included the condemned tract is not enough. That version was simply the landscape architectural firm's draft which was only approved by the Planning Commission subject to its recommendation that the boundaries be adjusted. It was never approved by the Board. Moreover, as already noted, various citizens groups opposed rezoning significant portions of the agricultural land within the Township commercial, and we cannot say that this had no influence on the ultimate decision to exclude the DiSantos' property from the enterprise district.
 
 
 72
 Therefore, even accepting the DiSantos' invitation to use hindsight, we conclude that the enactment of the enterprise district did not constitute an exceptional circumstance warranting relief. From this and our healthy respect for the finality of judgments, see, e.g. Kock, 811 F.2d at 246, we conclude that the district court's denial of the DiSantos' Rule 60(b) motion was within a sound exercise of discretion.
 
 D. Due Process and Just Compensation
 
 73
 The DiSantos' constitutional claims rest entirely upon their contention that the district court erred as to numerous discovery and evidentiary ruling and in denying their Rule 60(b) motion. Since all of the district court's rulings were proper, the DiSantos' constitutional claims are moot.
 
 III. CONCLUSION
 
 74
 We conclude that the district court committed no error in denying Alex and Dona DiSanto's post-trial motions for new trial and relief from judgment. We will, therefore, affirm the order of the district court denying those post-trial motions.
 
 
 
 [1]
 The authority for the government's condemnation is 40 U.S.C. Sec. 257 and 16 U.S.C. Sec. 1241. Section 257 authorizes the federal government to condemn property for public purposes, and Sec. 1241 specifically authorizes the government to condemn land for the Appalachian National Trail
 
 
 [2]
 The DiSantos contend that the district court relied upon the government's opposition to rezoning, despite the district court's statement to the contrary
 
 
 [3]
 Fed.R.Civ.P. 71A(h) provides, in part:
 "If the action involves the exercise of the power of eminent domain under the law of the United States, any tribunal specially constituted by an Act of Congress governing the case for the trial of the issue of just compensation shall be the tribunal for the determination of that issue; but if there is no such specially constituted tribunal any party may have a trial by jury of the issue of just compensation...."
 
 
 [4]
 42 U.S.C. Sec. 4651 provides, in pertinent part, that:
 (2) Real property shall be appraised before the initiation of negotiations....
 (3) Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property.... The head of the Federal agency concerned shall provide the owner of the real property to be acquired with a written statement of, and summary of the basis for, the amount he established as just compensation....
 
 
 [5]
 The date of the taking was November 8, 1989, the day the government deposited its payment of the judgment. Although the DiSantos' suggest that a date in early February 1990 might be the date of the taking, we believe that there is no basis for that claim